

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

CLAUDE BAXTER JOHNSON,    ]
                          ]
    Plaintiff(s),         ]
                          ]
vs.                       ] CV02-CO-02984-E
                          ]
STATE OF ALABAMA DEPARTMENT OF    ]
TRANSPORTATION,           ]
                          ]
    Defendant(s).         ]

**ENTERED**

JUL - 6 2004

MEMORANDUM OF OPINION

## I.    INTRODUCTION.

The plaintiff, Claude Baxter Johnson ("Johnson"), filed suit against the

defendant, State of Alabama Department of Transportation ("DOT"), on

December 6, 2002, alleging disparate treatment on account of race in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e—2000e-17, and 42 U.S.C. § 1981, due to his termination. [Compl.]

Johnson further alleged in his complaint a claim that the DOT retaliated

against him for his opposition to the DOT's discriminatory employment

practices. [Compl.] On February 20, 2003, the DOT filed a motion to dismiss for failure to comply with the administrative prerequisites of Title VII. [Doc. # 6.] On March 10, 2003, the DOT filed an amended motion to dismiss claims based on Eleventh Amendment immunity. [Doc. # 9.] On July 14, 2003, this court denied the DOT's motion to dismiss based on Johnson's failure to comply with administrative prerequisites to suit as Johnson established that he filed his complaint within 90 days of receipt of his right to sue letter. [Doc. # 27.] The court further denied the DOT's amended motion to dismiss Johnson's Title VII claims based on Eleventh Amendment immunity, as the Eleventh Amendment is not a bar to claims under Title VII. [Doc. # 27.] However, the court did grant the DOT's motion to dismiss Johnson's § 1981 claims, as they were barred by the State's Eleventh Amendment immunity. [Doc. # 27.]

Presently before the court is a motion for summary judgment, filed by the DOT on April 16, 2004. [Doc. # 39.] The parties have had a full and fair opportunity to fully brief the issues raised therein,[1] and the motion is now

[1] Plaintiff's disregard for the court's initial order pertaining to the schedule for submissions [Doc. # 7] has not escaped the court's attention. Plaintiff's blatant non-compliance with the court's order does not affect the outcome of the court's opinion on

ripe for decision.   Upon due consideration, the motion for summary

judgment will be granted in all respects.

II.   FACTS.[2]

Plaintiff Johnson worked continuously for the DOT from July 1977 to

July 2001, as a laborer and, subsequently, as an engineer assistant. [Johnson

Dep. at 15, 62.] On July 31, 1999, Johnson received an appointment to the

position of Civil Engineer but voluntarily requested a demotion to engineer

assistant. [Johnson Dep. at 62-65 & Def.'s Ex. 7.]

Johnson attended a sexual harassment workshop on August 27, 1999.

[Johnson Dep. at 71-72 & Def.'s Ex. 9.] Johnson also saw the DOT's sexual

harassment policy posted in the workplace which states in pertinent part:

> Further, ALDOT has given instructions that acts of sexual
> discrimination or harassment will not be tolerated, and will be
> subject to disciplinary action up to and including termination.

---

the present motion for summary judgment however and, as such, it will not be discussed
further.

[2]The facts set out below are gleaned from the parties' submissions of facts
claimed to be undisputed, their respective responses to those submissions, and the
court's own examination of the evidentiary record.   All reasonable doubts about the
facts have been resolved in favor of the nonmoving party.   *See Info. Sys. & Networks
Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).   These are the "facts" for
summary judgment purposes only.   They may not be the actual facts.   *See Cox v. Adm'r
U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[Johnson Dep. at 71-72 &  Def.'s Ex. 11.]

    A.      Johnson's Disciplinary Record.

          1.    Misuse of State Property.

On October 22, 1990, B.W. Stewart ("Stewart"), Division Engineer, suspended Johnson for ten days without pay for allegedly taking a DOT Igloo Industrial water cooler without permission. [Johnson Dep. at 58 & Def.'s Ex. 2.] Stewart requested that the property be returned immediately and warned Johnson that further misuse of state equipment or supplies would result in Stewart recommending that Johnson be terminated.  [Def.'s Ex. 2.] Stewart  informed Johnson that he could request a hearing regarding the matter.  [Def.'s Ex. 2.]  Johnson denied taking the water cooler and states that he was told he could not challenge his suspension. [Johnson Dep. at 59-60.]

On September 16, 1999, five DOT employees saw Johnson unloading a John Deere riding lawn mower from the DOT's carryall onto his personal truck. [Def.'s Ex. 12.] Johnson admitted hauling personal equipment back and forth for repairs but contends he was off the clock at the time. [Johnson Dep. at 79-80.]

On September 13, 2000, Johnson received notice that he would be suspended for five days for using his State truck to allegedly take an electric motor from a scrap yard without permission. [Johnson Dep. at 84-88 & Def.'s Ex. 16.]   Johnson was further advised that, following his suspension, he would not be allowed to drive a State vehicle for at least a month. [Def.'s Ex. 16.] Johnson explained that a worker at the scrap yard told him he could have the motor. [Johnson Dep. at 85-86.] Johnson, however, never challenged his suspension. [Johnson Dep. at 87.]

On January 10, 2001, a meeting was held with Johnson regarding his driving privileges, attendance, punctuality, and job responsibilities. [Def.'s Ex. 20.] He was reminded that he was still in a probationary period, and was not to use the State vehicle at any time for personal gain. [Def.'s Ex. 20.]

On March 1, 2001, Johnson was counseled after taking a State vehicle without permission. [Def.'s Ex. 21.] Johnson stated that he misunderstood the instructions and thought he had permission to take the State truck. [Johnson Dep. at 104 & Def.'s Ex. 21.]

2.    Johnson's Attendance and Punctuality.

On February 7, 1996, Eric English ("English"), Project Engineer, wrote F.L. Blakenship ("Blakenship"), Division Engineer, regarding Johnson's "problem with arriving at work on or before the appointed work time." [Def.'s Ex. 3.] On August 12, 1996, Robert Camp, District Engineer, placed a memo in Johnson's personnel file reflecting that on August 8, 1996, Johnson was late getting to work. [Def.'s Ex. 4.] Camp stated that the "few short minutes of being late to work by . . . [Johnson] cost him over 2-1/2 hours loss of work time, plus an additional employee 3 hours loss of work time and the use of a State vehicle to transport . . . [Johnson] to the job site." [Def.'s Ex. 3.]  On February 10, 1997, Gary Spears, Project Engineer, noted five instances when Johnson was late for work in the mornings or returning from lunch. [Def.'s Ex. 5.]

On Johnson's May 1999 Performance Appraisal, he was graded noncompliant in the area of punctuality for continuing to be late for work. [Def.'s Ex. 13.]  In an October 6, 2000, note to Johnson's personnel file, Shannon Jones, District Engineer, wrote that Johnson was late almost every day during the previous two weeks. [Id.]

On April 27, 2001, Johnson received a written warning regarding his tardiness. [Def.'s Ex. 22.]  On his May 2001 Performance Appraisal, Johnson was graded noncompliant in the areas of attendance, punctuality, and following rules. [Def.'s Ex. 19.]

### 3.    Sexual Harassment Allegations Against Johnson.

On July 29, 1999, English wrote DeJarvis Leonard ("Leonard"), Division Engineer, regarding Johnson having erections at the workplace.  English wrote that on many occasions, "Mr. Johnson is in an apparent state of excitement," and that "within the last day or two, Mr. Johnson was in an excited state, then proceeded to place a cup on the extended point of excitement (under his pants), and asked Henry Lindsey to observe what he was doing." [Def.'s Ex. 27 & Haynes Dep. at 30-32.] English requested that the Personnel Bureau counsel Johnson. [Id.]

On August 12, 1999, Gary Spears ("Spears"), Project Engineer, requested guidance from English regarding a new female employee who felt uncomfortable working alone with Johnson. [Def.'s Ex. 15.] The female employee, Joy Dickerson, stated that when she was sixteen years old, Johnson was working on a DOT project near her home, and walked into her

yard. [Id.] Dickerson asserted that Johnson approached her and made inappropriate comments to her. [Id.] She informed her father who, in turn, went to the DOT office to complain. [Id.] Dickerson stated that Johnson was ordered not to go into the yard again. [Id.] As a result of the incident, Dickerson claimed she did not feel safe alone with Johnson. [Def.'s Ex. 15.]

On August 16, 1999, Leonard, Blakenship, Mike Corley, Mary Golth, and Janet Snyder held a meeting with Johnson regarding several sexual harassment complaints against him. [Def.'s Ex. 8.] Specifically, Johnson was accused of "exposing himself in an excited state in front of other people" and "making sexual comments" to a female. [Id.] Johnson denied the allegations and stated that his fellow employees were picking on him and making ridiculing remarks to him. [Id.] Leonard stated that the complaints against Johnson would be investigated further and that he would be writing a letter to the Employee Assistance Program to help Johnson. Leonard further stated that Johnson would be transferred from District 4 to District 5. [Id.]

On June 29, 2001, Anthony Powell observed Johnson exhibiting sexually inappropriate behavior. [Def.'s Ex. 23.] Specifically, Powell stated

that, upon arriving to work, he saw Johnson "standing in front of the stove with an obvious erection." [Id.] Powell contends that this was not the first time he witnessed such behavior on the part of Johnson. [Id.]  Powell further stated that he, Michael Tims, and Keith Davis met with Johnson that afternoon and counseled him regarding his behavior and that it would not be tolerated. [Id.] Powell stated that Johnson acknowledged his behavior, agreed that it was out of place, and made mention of seeing a doctor to help him with his condition. [Id.]  Johnson testified that Tims, Davis, and Powell met with him but he did not know what they were talking about and he did not recall ever telling them that he was going to a doctor. [Johnson Dep. at 112-15.]

Reshonda Baggage, a DOT employee, testified at Johnson's Personnel Board hearing that in June 2001, she observed Johnson having an erection and the front of his pants was wet. [Def.'s Ex. 29.] Baggage stated that Johnson intentionally stood within her view. [Id.]  Johnson testified in his deposition that he did not have an erection and that his pants were wet because of a leaking cup. [Johnson Dep. at 110-11.]

Kevin Frames, a DOT employee, stated that Johnson made sexual

advances towards him. [Frames Dep. at 61.] Frames testified that on one occasion, while doing surveying work, Johnson had an erection and called Frames' attention to it by grunting. [Frames Dep. at 62-66.] Frames stated that while he was in a back area of the office, Johnson came up behind him and told Frames, "I got you now." [Frames Dep. at 66-69.] Frames testified that Johnson also told him that he wanted to grease Frames up and bend him over a log like in the movie *Deliverance*.  [Frames Dep. at 68.] Frames stated that Johnson would also make comments about Frames' buttocks. [Frames Dep. at 70-71.]

On July 16, 2001, Leonard referred Johnson to the DOT Employee Assistance Program due to the complaints of sexual harassment lodged against him. [Def.'s Ex. 24.] On July 17, 2001, Leonard, who is African-American, recommended possible termination of Johnson pending a complete investigation. [Def.'s Ex. 25.] Until a decision could be made regarding termination, Johnson was placed on ten days mandatory leave. [Def.'s Ex. 25.]

On July 22, 2001, Michael Tims, Civil Engineer, observed Johnson having an erection,  holding himself with his hands, and sticking his tongue

out and wallowing it around. [Tims Dep. at 104-20 & Tims Ex. 4.] On July 26,

2001, Tims observed Johnson wearing a shirt with sexual connotations

written on it. [Tims Dep. Ex. 4.] Tims told Johnson the shirt was

inappropriate for work and not to wear it or any other shirt like it anymore.

[Id.] Johnson stated that he saw nothing wrong with the shirt. [Johnson Dep.

at 154-55.]

B.      Johnson's Termination.

The DOT contends that in May 2001, Johnson made remarks to a

contractor about killing another worker. [Def.'s Ex. 28.] Lewis Pearson, a

Digitial One employee contracted to do work for the DOT, stated that

Johnson told him that he was married to Blakenship's daughter and that he

disliked Blakenship so much that he could "kill him." [Def.'s Ex. 29.]

Johnson testified that he is not married to Blakenship's daughter and that

he never told Pearson or anyone else that he was going to kill Blakenship.

[Johnson Dep. at 156-57.]

On July 27, 2001, Johnson received notice of his termination by letter

from Paul Bowlen, Transportation Director, for: (1) making remarks to a

contractor about killing another worker; (2) violating the DOT's sexual

harassment policy by making lewd and obscene gestures towards a female employee; and (3) wearing a t-shirt with an obscene picture and inappropriate language on it. [Def.'s Ex. 28.] On December 12, 2001, Johnson filed a charge of discrimination with the EEOC. [Def.'s Ex. 21.]

Johnson appealed his termination before the Personnel Board of the State of Alabama. [Def.'s Ex. 29.] On September 18, 2002, an Administrative Law Judge found that Johnson's dismissal was due to be upheld. [Def.'s Ex. 28.] On October 16, 2002, the Personnel Board affirmed the Administrative Law Judge's opinion. [Def.'s Ex. 30.] Johnson appealed the Personnel Board's decision to the Cleburne County Circuit Court. [Johnson Dep. at 143-44.] On April 9, 2004, the Alabama Court of Civil Appeals affirmed, without opinion, the Cleburne County Circuit Court's decision upholding Johnson's termination. [Def.'s Ex. 8.]

Leonard stated in his affidavit that, during his tenure as Division Engineer for the Fourth Division, "no other employees in the Department's Fourth Division have engaged in conduct similar in extent or severity as that engaged in by Mr. Johnson." [Def.'s Ex. 2.] Leonard further stated that he

had not "recommended for suspension or termination any other employee in the Fourth Division for violation of the Sexual Harassment policy." [Id.]

C.    Other DOT Employees.

In his deposition, Johnson identified the following white employees who committed similar offenses regarding attendance, punctuality, and misuse of State property and who were not terminated because of such violations.

1.    Kevin Frames.

Johnson alleged that Kevin Frames ("Frames"), a white DOT employee, searched for, hauled, and sold tires and scrap material in a State vehicle while on the clock. [Johnson Dep. at 36.] Johnson also stated that Frames went shopping for his supervisor in a State vehicle while on the clock. [Johnson Dep. 38-39.]

Frames testified that he was reprimanded for being late or absent from work approximately 15 times over a 5 year period. [Frame Dep. at 36-40.] He stated that he hauled a tractor-trailer tire in a State vehicle once, received $10.00 for it from a salvage place, and placed the money in the office drink fund. [Frames Dep. at 42-59.] Johnson alleged and Frames

affirmed that Rickey Emory, another white DOT employee, helped him load the tire onto the State vehicle. [Frames Dep. at 58-59.]

Frames denied shopping in a State vehicle or hauling items in it for his supervisor or other employees. He contends that he had permission to use the State vehicle to pick up his supervisor's birthday gift. [Frames Dep. at 48-49.]

### 2.   Norman Stewart.

Johnson stated in his deposition that Norman Stewart ("Stewart") would haul his lawnmowers on State vehicles and have them repaired while he was on the clock. [Johnson Dep. at 40.] Johnson testified that he was riding with Stewart on these occasions. [Id.] DOT employees Joe Haynes, Donald Powell, Shannon Jones, and Michael Tims all contend that they never saw Stewart with lawnmowers on his State vehicle. [Haynes Dep. at 23; Powell Dep. at 54; Jones Dep. at 37; Tims Dep at 81-82.]

### 3.   Joe Haynes.

Johnson stated in his deposition that Joe Haynes ("Haynes") searched for, hauled, and sold tires and other scrap while driving a State vehicle and while he was on the clock. [Johnson Dep. at 36.] Haynes denied this

allegation. [Haynes Dep. at 21-22.] Neither Tims nor Powell knew of Haynes committing these violations. [Powell Dep. at 55 & Tims Dep. at 84.]

       4.    Anthony Donald Powell.

On July 8, 1996, Anthony Powell ("Powell") received a written reprimand for taking leave without prior approval. [Powell Dep. Ex. 2.] On January 6, 1997, Powell received another written reprimand for taking leave without prior approval. [Powell Dep. Ex. 2.]  On his May 1996 and 1997 Performance Appraisal, Powell received an unsatisfactory rating in the area of attendance. [Powell Dep. Ex. 1 & 2.] Powell was graded noncompliant in the area of punctuality on his 2001 Performance Appraisal for being late for work. [Powell Dep. Ex. 3.] Powell was graded noncompliant in the areas of attendance and punctuality on his 2002 and 2003 Performance Appraisals. [Powell Dep. Ex. 4.]

Shannon Jones, Civil Engineer Manager, stated in his deposition that he had information that Powell went to an auto parts store in a State vehicle while on the clock. [Jones Dep. at 39.] Jones also testified that disciplinary action was being taken against Powell but that he would not recommend Powell's termination at this stage. [Jones Dep. at 29-30.]

5.    Amy Duncan.

Johnson testified that Amy Duncan ("Duncan") went to the video store in a State vehicle while working on the clock. [Johnson Dep. at 42.]  Jones testified that, in his position as supervisor, he had knowledge of Amy Duncan being written up, but not terminated for misuse of a State vehicle. [Jones Dep. at 39-40.] Jones stated that he confirmed that Duncan went and paid bills in a State vehicle. [Id.]

6.    Michael Tims.

Johnson testified in his deposition that Tims came in to work late and that he used his State vehicle to visit his girlfriend overnight. [Johnson Dep. at 91.] Tims received an unsatisfactory score on his 1991 and 1996 Performance Appraisals for punctuality. [Tims Dep. Ex. 2.] Tims testified that he does park his State vehicle at his girlfriend's house when he visits her but contends that he does so because he is on call 24 hours a day. [Tims Dep. at 86.]

7.    Shannon Jones.

Johnson claims that Jones misused his State vehicle by taking his baby to the babysitter. [Johnson Dep. at 45.] Johnson also alleges that Jones

requested a DOT mechanic to perform work on his home during the work day. [Johnson Dep. at 45-46.]

Jones stated that he was authorized to transport his child to the babysitter in a State vehicle because it had been permanently assigned to him and he is on call 24 hours a day. [Jones Dep. at 44-45.] Jones denies using a DOT mechanic to work on his home. [Jones Dep. at 46.]

        8.    Paula Jones.

Johnson testified that Paula Jones, Shannon Jones' wife and a DOT employee, came in late and left early. [Johnson Dep. at 47.] Tims and Haynes stated that they had no knowledge of this. [Tims Dep. at 100; Haynes Dep. at 26.]

III.    STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet his burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d

1220, 1224 (11th Cir. 2002)(quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991).

IV.   DISCUSSION.

As an initial matter, the DOT moved for summary judgment as to all of Johnson's claims.  [Doc. # # 39 & 40.] Although Johnson stated a claim of retaliation under Title VII in his Complaint, he neglected to address this claim in his response to the DOT's motion for summary judgment. Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  *Resolution Trust Corp. v. Dunmar Corp*, 43 F.3d 587, 599 (11th Cir. 1995).  As such, Johnson's unaddressed claim of retaliation will be dismissed without further discussion.

A.   Disparate Treatment — The Legal Framework.

Johnson alleges that he was subjected to disparate treatment discrimination in the terms and conditions of his employment with respect to his termination at the DOT.  In other words, Johnson contends that he was   terminated   for   allegations   of   violating   the   DOT's attendance/punctuality policy and for abusing/misusing State property while white employees, accused of the same actions, received less severe or no

disciplinary action at all.  Johnson claims he was treated more harshly than white employees on the basis of his race — an African-American.

"Whether an employer intentionally discriminated against an employee . . . is a question of fact, which may be proved either through direct or circumstantial evidence." *EEOC v. Joe's Stone Crab*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted).  Direct evidence of discrimination is evidence that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997).

Absent direct evidence of discriminatory intent, an employee may prove his case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* burden-shifting analysis, the plaintiff creates a rebuttable presumption of discrimination by proving a prima facie case of discrimination, which consists of proof that he was: (1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) treated differently than a similarly situated individual outside the protected class.  *Kelliher v.*

*Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).  The defendant can rebut

the presumption of discrimination by producing evidence of a legitimate,

non-discriminatory reason for the challenged employment action.  *Kelliher*,

313 F.3d at 1275.   Once the presumption is rebutted, the employer is

entitled  to  summary  judgment  unless  the  plaintiff  proffers  evidence

sufficient to permit a reasonable factfinder to conclude that the reasons

articulated by the defendant were mere pretext for discrimination.  *Id.*

> B.   Prima Facie Case of Discrimination.

As Johnson has produced no direct evidence of the DOT discriminating

against him, he must attempt to do so through circumstantial evidence.  The

DOT concedes that Johnson can establish the first three elements of a prima

facie case of race discrimination − an African-American who was qualified

for his position and who suffered an adverse employment action when he

was terminated.  Therefore, the only remaining question is whether Johnson

has established that a similarly situated employee outside the protected

class (a comparator) was disciplined less harshly for similar behavior.

Johnson contends that Kevin Frames, Shannon Jones, Paula Jones, Anthony

Powell, Joe Haynes, Mike Tims, Amy Duncan, Rickey Emory, and Norman

Stewart are all proper comparators in that they engaged in conduct similar to his, but were not terminated.

To make a proper comparison between the way he was treated and the way an individual outside the protected class was treated, Johnson "must show that he and the employee[] are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted).  To be similarly situated for purposes of establishing a prima facie case, a comparator must have been involved in or accused of the same or similar conduct as the plaintiff, but disciplined in a different way than the plaintiff.  *Holifield*, 115 F.3d at 1562.

The most important factors to consider in determining whether an employee is a proper comparator are the nature of the offenses committed and the nature of the punishments imposed.  *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998).  Indeed, "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1256, 1259 (11th Cir. 2001).  *See Maniccia v. Brown*, 171 F.3d 1364, 1369

(11th Cir. 1999) (Plaintiff not similarly situated to employees who each committed a single policy violation whereas Plaintiff had committed at least four policy violations).

The court is of the opinion that the DOT employees named by Johnson are not proper comparators as these employees were not accused of the same or similar conduct as Johnson.  Specifically, the named employees were involved in instances of misconduct that included tardiness, attendance, and using a State vehicle for personal matters.  None of them were accused of sexual misconduct in the form of making lewd and obscene gestures towards other employees or making threatening remarks about another worker.  Therefore, these DOT employees are not proper comparators, and Johnson has failed to prove the identity of a similarly situated employee outside the protected class who was treated more favorably than he.  As such, he has failed to establish a prima facie case of disparate treatment.

C.    Non-discriminatory Reason and Proof of Pretext.

However, even if Johnson could establish a prima facie case of race discrimination, the DOT has proffered legitimate, non-discriminatory reasons

for terminating Johnson, and he cannot show that these reasons were merely pretext for race discrimination. The DOT alleges that it terminated Johnson for violation of policies pertaining to sexual harassment, attendance, punctuality, abuse/misuse of state property, wearing an obscene shirt, and making threatening remarks about killing another worker. Assuming Johnson could establish a prima facie case of race discrimination, he would have to amass evidence sufficient to permit a reasonable factfinder to conclude that these articulated reasons were mere pretext for discrimination.

An employee cannot establish pretext "by simply quarreling with the wisdom of the [employer's] reason." *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Rather, the employee must establish that the employer's proffered reasons are "unworthy of credence, or that the defendant [was] more likely motivated by a discriminatory reason." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). To be unworthy of credence, the employer's proffered reason must be rife with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradiction." *Standard v. A.B.E.L. Servc., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). Ultimately,

"[t]he pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs." *Id.* at 1332-33. So long as the employer has a good faith belief that the employee engaged in conduct warranting termination, the employer is entitled to summary judgment. *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000).

Johnson only argues that the DOT's accusations against him of sexual misconduct and making threats against another employee are false. Johnson has provided no evidence to suggest that the real reason the DOT terminated him was because of his race.  Whether or not the underlying allegations against Johnson are true, the DOT held a good faith belief that evidence presented at Johnson's personnel hearing and his past disciplinary actions warranted Johnson's termination.  Johnson has not shown that the DOT's proffered reasons are unworthy of credence.  As such, Johnson cannot establish that the DOT's articulated reasons for terminating him were mere pretext for race discrimination.  Therefore, even if Mr. Johnson could establish a prima facie case of discrimination, the DOT's motion for summary judgment is still due to be granted.

V.    CONCLUSION.

The DOT's motion for summary judgment is due to be granted on all counts.  The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___6___ of July, 2004.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE